# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Ronald Bernard,
duly appointed representative for
Todd Michael Bernard, deceased,

       Plaintiff,

v.

Carolyn W. Colvin,
Acting Commissioner of Social Security,

       Defendant.

Civ. No. 12-1501 (DSD/JJK)

**REPORT AND RECOMMENDATION**

---

Edward F. Rooney, Esq., 100 North Sixth Street, Suite 550A, Minneapolis, MN 55403, counsel for Plaintiff.

Ana H. Voss, Esq., Assistant U.S. Attorney, 600 United States Courthouse, 300 South Fourth Street, Minneapolis, MN 55415, counsel for Defendant.

---

JEFFREY J. KEYES, United States Magistrate Judge

Pursuant to 42 U.S.C. § 405(g), Plaintiff Ronald Bernard, representative for Todd Michael Bernard,[1] seeks judicial review of the final decision of the Commissioner of Social Security (the "Commissioner"),[2] who denied Plaintiff's

---

[1]     The Court will use the term "Plaintiff" to refer to Todd Bernard. The Court will refer to Ronald Bernard, acting here as representative for Todd Bernard, as "Bernard."

[2]     Carolyn W. Colvin became Acting Commissioner of Social Security on February 14, 2013. Colvin is automatically substituted as the Defendant in this

(Footnote Continued on Next Page)

applications for disability insurance benefits ("DIB") and supplemental security income ("SSI"). The parties have filed cross-motions for summary judgment. (Doc. Nos. 12, 14.) This matter has been referred to the undersigned for a Report and Recommendation pursuant to 28 U.S.C. § 636 and D. Minn. LR 72.1. For the reasons stated below, this Court recommends denying Plaintiff's motion and granting Defendant's motion.

## BACKGROUND

### I.    Procedural History

Plaintiff protectively filed applications for disability insurance benefits and supplemental security income on November 27, 2007, alleging a disability onset date of April 14, 2007. (Tr. 147–56.)[3] The Social Security Administration ("SSA") denied Plaintiff's claims initially on March 10, 2008 (Tr. 67–76), and on reconsideration on July 31, 2008. (Tr. 83-89.) Plaintiff filed a timely request for a hearing before an Administrative Law Judge ("ALJ"). (Tr. 90–91.) Plaintiff died before the hearing, and Ronald Bernard, Todd Bernard's brother and Personal Representative of his estate, was substituted in his place. (Tr. 100–02.) The hearing was held on June 22, 2010. (Tr. 36–57.) On August 30, 2010, the ALJ

(Footnote Continued from Previous Page)

matter for Michael J. Astrue, the former Commissioner of Social Security. *See* 42 U.S.C. § 405(g); Fed. R. Civ. P. 25(d).

[3]    Throughout this Report and Recommendation, the abbreviation ("Tr.") is used to reference the Administrative Record. (Doc. No. 5.)

issued an unfavorable decision on Plaintiff's applications.  (Tr. 20–35.)  And the

Appeals Council denied the request for review on April 20, 2012.  (Tr. 1–6.)

Denial of review made the ALJ's decision the final decision of the Commissioner.

*See* 20 C.F.R. §§ 404.981, 416.1481.  This action was filed on behalf of Plaintiff

on June 22, 2012, seeking judicial review of the Commissioner's decision

pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).  (Doc. No. 1.)  On August 24,

2012, Defendant filed an answer and a certified copy of the administrative record.

(Doc. Nos. 4, 5.)  Pursuant to D. Minn. LR 7.2, the parties brought cross-motions

for summary judgment.  (Doc. Nos. 12, 14.)

## II.    Factual Background

Plaintiff completed high school and worked in the past as a laborer, last

working for a temporary agency.  (Tr. 185, 188, 191, 255.)  When the agency no

longer had work for him, he went on unemployment and was unable to find work

after April 14, 2007.  (Tr. 185.)  Plaintiff was 44-years-old on April 14, 2007, his

alleged disability onset date.  (Tr. 150.)  He alleged disability due to anxiety,

depression, alcohol abuse, cramping, and difficulty breathing.  (Tr. 185, 212.)

Plaintiff was murdered on July 4, 2009.  (Tr. 354–55.)  Plaintiff's representative

now seeks reversal or remand of the ALJ's decision based solely on Plaintiff's

mental impairments.

### A.    State Agency Consultant Opinions

Dr. James Alsdurf reviewed Plaintiff's social security disability file on

February 9, 2008, for an initial decision on Plaintiff's applications for social

security disability benefits.  (Tr. 275–95.)  Dr. Alsdurf concluded that Plaintiff had the residual functional capacity ("RFC") to concentrate on, understand, and remember routine, repetitive, 3-4 step, uncomplicated instructions; carry out routine, repetitive tasks with adequate persistence or pace; maintain brief and superficial contact with coworkers and the public; follow an ordinary routine with the ordinary level of supervision found in most customary work settings;  and adequately handle the stress of a routine, repetitive, 3-4 step work setting. (Tr. 294.)  Dr. R. Owen Nelson reviewed Plaintiff's social security disability file on reconsideration of his disability applications on July 30, 2008, and he affirmed Dr. Alsdurf's RFC opinion.  (Tr. 335–37.)

## B.    Medical Records

Social Worker Michael Graff and Psychiatrist Roger Johnson evaluated Plaintiff for depression at St. Anthony Mental Health Clinic on December 12, 2007.  (Tr. 325–29, 332–33.)  Graff noted that Plaintiff was poorly groomed but had good eye contact.  (Tr. 326.)  Plaintiff's mood was depressed, his affect was anxious, he exhibited some scanning and vigilance, and he was cooperative, polite, and oriented.  (*Id.*)  On mental status examination, he could spell and count, he denied delusions and hallucinations, and there was no sign of disturbed thinking.  (*Id.*)  Plaintiff said he was on good terms with his parents and siblings.  (*Id.*)  He had prior domestic assault charges involving his girlfriends and three prior DUIs leading to the loss of his driver's license.  (Tr. 327.)  Graff diagnosed Plaintiff with major depressive disorder and alcoholism.  (Tr. 328.)  He

4

assessed Plaintiff with a GAF score of 45.[4]  (*Id.*)  Plaintiff's treatment plan was to stay sober, apply for disability, attend AA, and resolve underlying reasons for depression.  (*Id.*)  Dr. Johnson agreed with Graff that Plaintiff easily met the criteria for major depressive disorder and prescribed fluoxetine and trazadone.  (Tr. 332.)  When Plaintiff saw Graff again in January 2008, he was feeling less depressed and seemed more energetic.  (Tr. 331.)  He stated that he spent his days watching television, and he did not visit his family because he was ashamed of his lifestyle.  (*Id.*)  At that time, Plaintiff told Dr. Johnson he quit Prozac and trazadone due to side effects, but he agreed to try the medication mirtazapine.  (*Id.*)  Dr. Johnson completed a medical opinion form on February 12, 2008, in support of Plaintiff's application for state benefits.  (Tr. 333.)  He diagnosed Plaintiff with major depressive disorder, and opined Plaintiff was unable to work due to feeling hopeless, helpless, anhedonic, and irritable, with poor sleep and poor memory.  (*Id.*)

Five days later, Plaintiff underwent a psychological consultative examination with Dr. Alford Karayusuf, at the request of the SSA.  (Tr. 272–74.)  Plaintiff reported that he was often very nervous, and he felt hopeless and was thinking of quitting his search for a job.  (Tr. 272.)  Dr. Karayusuf noted that

---

[4]     The Global Assessment of Functioning Scale is used by clinicians to subjectively rate the social, occupational, and psychological functioning of adults.  *Diagnostic and Statistical Manual of Mental Disorders* 32 ("*DSM-IV-tr*") (American Psychiatric Association 4th ed. text revision 2000).  Scores between 41 and 50 indicate serious symptoms such as suicidal ideation, or any serious impairment in social, occupational, or school functioning.  *Id.* at 34.

Plaintiff was seriously trembling throughout the interview. (*Id.*) There were no medical reports for Dr. Karayusuf to review, and Plaintiff had not received outpatient care until just before the consultative examination. (*Id.*) Plaintiff admitted to a long history of alcohol and marijuana use, with his last chemical dependency treatment in 2003. (*Id.*) He reported that his last drink was one month earlier. (*Id.*) He had been jailed fifteen times for domestic violence and DUIs, but he never went to prison. (Tr. 273.) Dr. Karayusuf noted Plaintiff's symptoms were depression, poor sleep, fluctuating appetite, diminished concentration and memory, anxiety, constant worry, racing thoughts, and constant shaking. (Tr. 272.) He also noted that Plaintiff had a history of withdrawal tremors. (Tr. 273.) Plaintiff reported that he lived with a male roommate, with whom he got along well. (*Id.*) But he could only sleep four or five hours at night. (*Id.*) He rode the bus when needed, went shopping, and did housework, and he spent his days primarily watching television. (*Id.*) Plaintiff had two friends whom he saw once a month. (*Id.*) And he got along well with his parents – he spoke to them on the phone weekly, but saw them only twice a year. (*Id.*)

On mental status examination, Plaintiff was oriented, his immediate recall was fair, his recent and remote memory were intact, his intelligence was dull normal, his insight was minimal, his manner was tense, anxious, and trembling, and his affect was subdued and unhappy. (*Id.*) Dr. Karayusuf questioned whether Plaintiff's tremors were from alcohol withdrawal or anxiety, and he

diagnosed Plaintiff with alcohol dependence in tenuous remission, generalized anxiety disorder, and depression NOS.  (Tr. 273–74.)  Dr. Karayusuf opined that Plaintiff could understand, retain, and follow simple instructions, but his tremors would prevent effective interaction with others.  (Tr. 274.)  Plaintiff's tremors and depression would also preclude maintaining persistence or pace.  (*Id.*)  Dr. Karayusuf's opinion presumed that Plaintiff was completely sober, and his tremors were not from alcohol withdrawal.  (*Id.*)

On May 12, 2008, Plaintiff visited Dr. David Klevan for routine health maintenance.  (Tr. 311–13.)  At that time, Dr. Klevan noted that Plaintiff drank more than six beers daily, he spent six months in jail on a domestic violence charge, he was not working, he lived with a friend, he drank before the appointment, and he looked "to be clearly losing control of his life with alcohol."  (Tr. 311–12.)

Plaintiff did not seek therapy with Graff again until June 25, 2008, explaining that he had been drinking quite a bit, not making appointments, and not taking care of himself.  (Tr. 330.)  He stated he wanted help with his feelings of depression.  (*Id.*)  Plaintiff's insurance, however, did not cover his visits to Graff, and he did not return for therapy again until November 4, 2008.  (Tr. 361.)  In November, Graff found Plaintiff to be about the same—still drinking beer almost every day.  (*Id.*)  Graff noted that Plaintiff liked to drink, hang out with "the guys," and play poker.  (*Id.*)  Plaintiff also watched television during the day, and occasionally did some handyman work.  (*Id.*)  By appearance, Plaintiff was

euthymic, but he endorsed the criteria for major depressive disorder.  (*Id.*)
Plaintiff said he had not been especially depressed most of the summer, but he
just was not up for finding a job.  (*Id.*)  Plaintiff said he felt anxiety most of the
time, explaining, "I get bored and don't know what to do."  (*Id.*)  In his notes, Graff
wrote, "Todd was told he does not qualify for SS benefits.  I certainly see why
that decision was reached."  (*Id.*)

Plaintiff was feeling depressed when he visited Graff about six months
later, on May 4, 2009.  (Tr. 359.)  Graff noted that Plaintiff had no life beyond
drinking.  (*Id.*)  He also noted that Plaintiff was not close to his family, his social
interests were very limited, and he spent most of his days doing some light
housework and watching television.  (*Id.*)  At that time, Dr. Johnson noted that
Plaintiff was in a major depressive episode, and his insomnia was severe.  (*Id.*)
He wanted Plaintiff to resume taking mirtazapine.  (*Id.*)

The next week, Plaintiff told Graff that he was sleeping much better but
fighting with his roommate constantly.  (Tr. 358.)  Graff noted that Plaintiff was
46-years-old but looked ten years older; Plaintiff was very thin and wheezed
when he inhaled.  (*Id.*)  In addition, Plaintiff's mind wandered, and it took him an
hour to get up in the morning and have his first cigarette.  (*Id.*)  During this
meeting, Plaintiff said that if his disability application was denied, he might just
have to go get a job.  (*Id.*)

Plaintiff returned to Graff and Dr. Johnson on June 9, 2009.  (Tr. 356–57.)
Dr. Johnson noted that Plaintiff's sleep was improved, but he remained

depressed with low energy. (Tr. 356.) Plaintiff reportedly did not have side effects from his medication, and Dr. Johnson recommended adding buproprion. (*Id.*) At that time, Plaintiff told Graff that life overwhelmed him, and he did not like to get out of bed. (*Id.*) He also told Graff that he was undecided about going to his family reunion because he was ashamed of his life. (*Id.*) Plaintiff was still drinking two or three beers per night. (*Id.*)

On July 4, 2009, Plaintiff was found beaten to death in his apartment. (Tr. 354–55.) Plaintiff's brother, as Plaintiff's representative, took over his social security disability claim. (Tr. 256.) Plaintiff's attorney asked Dr. Johnson and Michael Graff to complete a mental impairment questionnaire in support of Plaintiff's disability claim, which they did jointly on June 3, 2010 ("Johnson/Graff opinion"). (Tr. 368–74.) That questionnaire shows that Graff saw Plaintiff for eight sessions between December 2007 and June 2009, and Dr. Johnson saw Plaintiff for four sessions. (Tr. 369.) They diagnosed Plaintiff with alcoholism and major depressive disorder, with a GAF score of 43. (*Id.*) On the questionnaire, they checked off many signs and symptoms of mental illness that Plaintiff exhibited. (Tr. 370.) They also found Plaintiff to be seriously limited in or unable to meet competitive standards for all mental abilities needed to do unskilled, semi-skilled, or skilled work. (Tr. 371–72.) In addition, Graff and Dr. Johnson agreed that Plaintiff had extreme limitations in activities of daily living and maintaining social functioning. (Tr. 373.) They indicated that Plaintiff also had marked limitations in maintaining concentration, persistence, or pace,

9

and had four or more episodes of decompensation. (*Id.*) They indicated that Plaintiff met the Paragraph C criteria of an anxiety-related disorder.[5] (*Id.*) They believed Plaintiff's mental impairments would cause him to miss work more than four days per month. (Tr. 374.) They also agreed that alcohol abuse contributed to Plaintiff's limitations, but his limitations would be the same if he was abstinent from alcohol because when he was not drinking he presented as a "broken man." (*Id.*)

## III.    Testimony at Administrative Hearing

On June 22, 2010, Plaintiff's brother, Ronald Bernard, and Plaintiff's former roommate, Isaiah Lewis, testified at a hearing before Administrative Law Judge Diane Townsend Anderson. (Tr. 38, 40–41, 44.) Dr. Joseph Horozaniecki testified as a medical expert, and Julie Harren testified as a vocational expert. (Tr. 38.)

Ronald Bernard testified that Plaintiff never seemed to be able to "get his head screwed on straight." (Tr. 41.) Barnard stated that Plaintiff never worked in one place very long, and he preferred talking to his family over the phone rather than visiting. (Tr. 43.)

Isaiah Lewis shared an apartment with Plaintiff for seven years, and he said Plaintiff was stressed and shook all the time. (Tr. 44–45.) Lewis testified

---

[5]    Paragraph C of the listing for anxiety-related disorders directs disability when the paragraph A criteria are met and when the claimant's anxiety-related disorder results in the complete inability to function independently outside the area of one's home. 20 C.F.R., Part 404, Subpart P, Appendix 1, §12.06.

that Plaintiff helped him by taking him to the store because Lewis had problems with his eyesight.  (Tr. 45.)  Lewis also testified that Plaintiff was depressed more than he was happy, and he did not sleep well.  (*Id.*)  According to Lewis, Plaintiff drank alcohol once a week, or whenever he got paid, but sometimes he did not drink for three weeks.  (*Id.*)  Lewis also observed that Plaintiff's tremors did not stop when he was sober, and Plaintiff did not appear to be happier when sober.  (Tr. 49.)  However, Plaintiff's tremors were not as violent after he started taking medication.  (Tr. 49–50.)  Lewis felt Plaintiff gave up on life because of the death of someone he cared for and due to his drinking problem.  (Tr. 46.)  Lewis testified that although he and Plaintiff were unemployed after April 2007, they received reduced rent in exchange for acting as custodians in the apartment building where they lived.  (Tr. 46–47.)  They split the work evenly, but Lewis often had to remind Plaintiff to do his share of the work.  (Tr. 48.)  Otherwise, Plaintiff spent time looking for employment, riding his bike to apply at nearby industrial buildings, and watching television.  (*Id.*)

Dr. Horozaniecki, as an independent medical expert, testified about Plaintiff's physical impairments.  (Tr. 50–51.)  He did not see any evidence in the record regarding the cause of Plaintiff's tremors.  (Tr. 51.)  According to Dr. Horozaniecki, if Plaintiff's tremors persisted during three-week periods of abstinence from alcohol, it would diminish the likelihood that the tremors were caused by alcohol withdrawal.  (Tr. 52.)

Julie Harren testified as a vocational expert. (Tr. 52.) The ALJ asked Harren to consider a hypothetical person who was 46-years-old at the time of death, impaired by alcohol dependence, generalized anxiety, depression, emphysema, and tremors of questionable etiology; who could lift and carry twenty pounds occasionally, ten pounds frequently; perform all functional aspects of light work; work in an alcohol-free environment, with no exposure to temperature or humidity extremes or concentrated exposure to irritants; limited to brief and superficial contact with others; work with low to moderate standards for persistence and pace; and limited to routine, repetitive tasks. (Tr. 52–53.) Harren testified that such a person could possibly perform some of Plaintiff's past work as he described it, but she could not match his past work and earnings records. (Tr. 53.) Harren further testified that there were other light jobs the hypothetical person could perform, including packagers and assemblers.[6]

For a second hypothetical question, the ALJ added the limitations that the individual would be unable to meet competitive standards for following instructions or act appropriately with others in the workplace or the public, and who would be absent from work more than two days per month. (Tr. 54.) Harren testified there would not be any work for such an individual. (*Id.*) Harren also testified that if Plaintiff's tremors and depression would prevent him from interacting effectively with others, and preclude him from maintaining persistence

---

[6]     Respectively, DOT Code 559.687-074, with 7,500 jobs in Minnesota, and DOT Code 794.687-046, with 12,500 jobs in Minnesota. (Tr. 53–54.)

and pace, there would not be any jobs he could have performed in competitive employment.  (Tr. 55.)

## IV.    Disability and Function Reports

Plaintiff completed a function report for the SSA on December 7, 2007. (Tr. 200–07.)  At that time, Plaintiff's activities included watching television, doing errands, mowing the lawn, shoveling snow, cleaning the house, walking the dog, doing laundry, and washing dishes.  (Tr. 200.)  He played poker once a week with friends, and he went outside daily and walked, rode a bike, used public transportation, or got rides from friends.  (Tr. 203–04.)  Plaintiff also stated he could not sleep due to anxiety attacks.  (Tr. 201.)  He was nervous and shaky around others but had no problems getting along with family, friends, and neighbors.  (Tr. 205.)  And he had been fired for not getting along with others and described the reason as "watch them do nothing well [sic] I do all the work." (Tr. 206.)  In addition, Plaintiff stated that he did not handle stress or changes in routine well.  (*Id.*)

## V.    The ALJ's Findings and Decision

The ALJ issued a decision on August 30, 2010.  (Tr. 20–30.)  The ALJ followed the five-step procedure for determining if an individual is disabled.  *See* 20 C.F.R. § 404.1520(a).  She found that Plaintiff had the following severe impairments: emphysema, tremors, affective disorder, anxiety disorder, and alcohol dependence.  (Tr. 25.)  The ALJ determined that Plaintiff's impairments did not meet or medically equal an impairment listed in 20 C.F.R. Part 404,

Subpart P, App. 1.  (Tr. 26.)  She found that Plaintiff retained the capacity to "perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except involving: no exposure to extremes of temperature or concentrated airway irritants; routine repetitive tasks; low to moderate standards for pace and production; brief and superficial contact with others; and work performed in an alcohol free environment."  (Tr. 27.)  Based on the vocational expert's testimony, the ALJ concluded that Plaintiff could perform his past relevant work as a laborer, and therefore, found that he was not disabled.  (Tr. 29–30.)

## DISCUSSION

### I.    Standard of Review

Congress has prescribed the standards by which Social Security disability benefits may be awarded.  "Disability" under the Social Security Act means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]

42 U.S.C. § 423(d)(2)(A).

The claimant bears the burden of proving his or her entitlement to disability benefits under the Social Security Act. *See* 20 C.F.R. §§ 404.1512(a); 416.912(a); *Young v. Apfel*, 221 F.3d 1065, 1069 n.5 (8th Cir. 2000). Once the claimant has demonstrated that he or she cannot perform past work due to a disability, "the burden of proof shifts to the Commissioner to prove, first that the claimant retains the residual functional capacity to do other kinds of work, and second, that other work exists in substantial numbers in the national economy that the claimant is able to do." *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000).

Review by this Court of the Commissioner's decision to deny disability benefits to a claimant is limited to a determination of whether the decision of the Commissioner is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); *Baker v. Barnhart*, 457 F.3d 882, 892 (8th Cir. 2006). "There is a notable difference between 'substantial evidence' and 'substantial evidence on the record as a whole.'" *Gavin v. Heckler*, 811 F.2d 1195, 1199 (8th Cir. 1987) (citation omitted). "Substantial evidence 'means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Reed v. Sullivan*, 988 F.2d 812, 814 (8th Cir. 1993) (internal quotation omitted). "'Substantial evidence on the record as a whole,' . . . requires a more scrutinizing analysis." *Gavin*, 811 F.2d at 1199. "The substantial evidence test employed in reviewing administrative findings is more than a mere search of the record for evidence supporting the [Commissioner's] findings." *Id.* (citing *Parsons v.*

*Heckler*, 739 F.2d 1334, 1339 (8th Cir. 1984)). In reviewing the administrative decision, "'[t]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight.'" *Id.* (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951)).

In reviewing the record for substantial evidence, the Court may not substitute its own opinion for that of the ALJ. *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993). The Court may not reverse the Commissioner's decision merely because evidence may exist to support the opposite conclusion. *Mitchell v. Shalala*, 25 F.3d 712, 714 (8th Cir. 1994); *see also Woolf*, 3 F.3d at 1213 (concluding that the ALJ's determination must be affirmed, even if substantial evidence would support the opposite finding). The possibility that the Court could draw two inconsistent conclusions from the same record does not prevent a particular finding from being supported by substantial evidence. *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994).

## II.    Analysis

### A.    Residual Functional Capacity

Bernard contends that the ALJ did not apply the correct legal standard to determine residual functional capacity because the ALJ formulated the RFC first, and then judged the impairments against the RFC. (Doc. No. 13, Pl.'s Mem. of Law in Supp. of Mot. for Summ. J. ("Pl.'s Mem.") 22–23.) Bernard cites the following paragraph in the ALJ's decision:

16

> After careful consideration of the evidence, the undersigned finds
> that the claimant's medically determinable impairments could
> reasonably be expected to cause the alleged symptoms; however,
> statements concerning the intensity, persistence and limiting effects
> of these symptoms are not credible to the extent they are
> inconsistent with the above residual functional capacity assessment.

(*Id.* at 23 (citing Tr. 27).)  Bernard asserts that 20 C.F.R. § 404.1527 requires the

ALJ to evaluate the claimant's impairments based on the medical opinions and

other evidence before the RFC is formulated, and to do the opposite is error.  (*Id.*

(citing *Bjornson v. Astrue*, 671 F.3d 640, 645-46 (7th Cir. 2012) (criticizing

meaningless boilerplate language in ALJ's decision where ALJ did not link

conclusory statements to evidence in the record)).)

The Commissioner asserts that the ALJ's use of boilerplate language does

not indicate that the ALJ failed to consider the credibility of Plaintiff's subjective

complaints in arriving at the RFC determination.  (Doc. No. 15, Def.'s Mem. in

Supp. of Mot. for Summ. J. ("Def.'s Mem.") 22–23.)  In addition, the

Commissioner asserts the ALJ properly discussed the factors that guided her

credibility determination, including Plaintiff's course of treatment, objective

medical evidence, and activities of daily living.  (*Id.* at 22.)

It is true that the ALJ used boilerplate language to begin the discussion of

her credibility analysis, but the ALJ's analysis consisted of more than boilerplate.

The last paragraph of the ALJ's RFC discussion provides:

> In reaching an assessment of the claimant's residual functional
> capacity the undersigned has accorded the claimant the benefit of all
> doubt in imposing exertional and nonexertional limitations in the
> workplace.  However, the undersigned cannot find the claimant

17

> credible that he is incapable of all work activity, as a result of his
> impairments, because of the significant inconsistencies in the record
> as a whole.

(Tr. 29.) Unlike the earlier paragraph, the ALJ stated that she considered

Plaintiff's subjective complaints "[i]n reaching an assessment of the claimant's

residual functional capacity." (*Id.*) This suggests the ALJ did not improperly

determine RFC before addressing credibility. More importantly, in the preceding

paragraphs of the decision, the ALJ explained the inconsistencies she found in

the record between Plaintiff's subjective complaints and his course of treatment,

the objective evidence, his work history, and his activities of daily living. This

Court concludes that the ALJ applied the proper legal standard in determining

Plaintiff's RFC. *See Jones v. Comm'r of Soc. Sec.*, No. 2:12-cv-110, 2012 WL

5378850, at *7 (S.D. Ohio Oct. 30, 2012) (distinguishing *Bjornson* and

suggesting a court's review of the ALJ's credibility analysis should be to examine

reasons given by the ALJ for finding plaintiff less than fully credible, and deciding

if the record supports that finding). Therefore, the remaining issue for this Court

to determine is whether the ALJ's decision was supported by substantial

evidence in the record.

### B. Weighing the Medical Opinions

Bernard contends the ALJ erred in several ways when weighing the

medical opinion evidence. First, he argues the joint opinion of Dr. Johnson and

Mr. Graff should have been given the greatest weight under the factors described

in 20 C.F.R. § 404.1527(c)(2).[7]  (Pl.'s Mem. 17–21.)  Bernard points out that Dr. Johnson and Mr. Graff treated Plaintiff for eighteen months, discussing deeply personal matters, and that they were the only mental health providers to treat Plaintiff.  (*Id.* at 18–19.)  Further, Bernard asserts that Dr. Johnson and Mr. Graff supported their opinion by citing numerous signs and symptoms they observed when treating Plaintiff.  (*Id.* at 19.)  Bernard also contends that Dr. Johnson's and Mr. Graff's opinion is consistent with Dr. Karayusuf's opinion and with the remainder of the evidence in the record, excluding the nonexamining consultants' opinions.  (*Id.*)  Finally, Bernard points out that Dr. Johnson and Mr. Graff are mental health specialists.  (*Id.* at 20.)  And Bernard asserts that Dr. Karayusuf's opinion, as the consultative psychological examiner, should be afforded the next greatest weight.  (*Id.*)

Second, Bernard contends the ALJ erred in giving the greatest weight to the state agency medical consultants' opinions because they are contrary to the opinions of the treating and examining medical sources and because Drs. Alsdurf and Nelson did not review the entire evidentiary record in formulating their opinions.  (*Id.* at 20–21.)  Bernard notes that Dr. Alsdurf formulated his opinion on February 9, 2008, and Dr. Nelson affirmed on July 30, 2008, before the Johnson/Graff opinion was included in the record.  (*Id.* at 21.)

---

[7]     The factors are: (1) length of the treatment relationship and the frequency of examination; (2) nature and extent of the treatment relationship; (3) supportability; (4) consistency; (5) specialization; and (6) other factors which tend to support or contradict the opinion.

Third, Bernard contends the ALJ failed to offer good reasons for rejecting the treating providers' opinions and the consultative examiner's opinion. (*Id.* at 21–22.) Bernard asserts that Plaintiff's performance of modest household work and social activities do not indicate the ability to sustain competitive employment. (*Id.*) And Bernard also asserts that Plaintiff's sporadic and ineffectual efforts to obtain employment are in fact consistent with his depression by evidencing lack of motivation, energy, and concentration. (*Id.*) Fourth, Bernard asserts that Plaintiff's disability reports and the hearing testimony of Bernard and Lewis are consistent with the Johnson/Graff opinion and Dr. Karayusuf's opinion. (*Id.* at 22.)

In response, the Commissioner asserts that Dr. Johnson only saw Plaintiff four times between December 2007 and June 2009, and the Johnson/Graff opinion was largely based on Plaintiff's subjective complaints. (Def's Mem. 9–10.) The Commissioner also contends that the Johnson/Graff opinion was inconsistent with the record as a whole because they opined Plaintiff could not function outside the home due to anxiety, but Plaintiff said that he walked, used public transportation, rode a bike, and had friends drive him to places. (*Id.* at 12.) Dr. Johnson and Mr. Graff also opined that Plaintiff could not relate to people in general, and he essentially withdrew from life; but Plaintiff said he played poker with his friends once a week, talked to family on the phone, and took his roommate to the store. (*Id.*) In addition, Dr. Johnson and Mr. Graff opined that

Plaintiff could not perform even limited employment, but the record reflects that he acted as a custodian for his apartment in return for reduced rent.  (*Id.*)

The Commissioner also contends that Mr. Graff's treatment records do not support the extreme limitations in the Johnson/Graff opinion, such as serious limitations in the ability to understand, remember, and carry out very short, simple instructions and ask simple questions, because Plaintiff was alert, oriented, polite, cooperative, and demonstrated normal thought processes.  (*Id.* at 14–15.)  In another of Mr. Graff's records, he noted that Plaintiff endorsed the criteria for major depressive disorder, but he appeared to be in a normal, non-depressed mood.  (*Id.* at 15.)  The Commissioner also points out that Plaintiff said he was not especially depressed for much of the summer, but he was not up to looking for a job.  (*Id.* at 16.)  And Graff noted that he could see why Plaintiff was denied disability benefits.  (*Id.*)

Dr. Karayusuf's opinion was not entitled to more weight, according to the Commissioner, because his opinion was based on only one visit, and no other medical source opined that Plaintiff's tremors rendered him disabled.  (*Id.* at 16–17.)  Nonetheless, the Commissioner asserts that the ALJ made appropriate concessions for Plaintiff's tremors in the RFC finding, by reducing Plaintiff to work with low to moderate standards of pace and production, and by limiting Plaintiff to brief and superficial contact with others.  (*Id.* at 18.)

Finally, the Commissioner argues that the ALJ gave appropriate weight to Drs. Aldurf's and Nelson's opinions because they were consistent and supported

by the record as a whole.  (*Id.*)  Additionally, the Commissioner asserts that evidence submitted after the Johnson/Graff opinion does not reveal any worsening of Plaintiff's symptoms, and the evidence, in fact, showed improvement with treatment.  (*Id.* at 18–21.)

In reply, Bernard notes that Dr. Johnson and Mr. Graff opined that Plaintiff could not function independently outside of his home, not that he could not function outside his home at all.  (Doc. No. 16, Pl.'s Reply Mem. of Law in Supp. of Mot. for Summ. J. ("Reply") 4.)  Bernard also points out that Dr. Johnson and Mr. Graff did not say that Plaintiff withdrew from life entirely, but that he "withdrew from *normal* adult life."  (*Id.* (emphasis added in Reply).)  Bernard asserts these findings are consistent with Plaintiff's activities.  (*Id.*)  In addition, Bernard notes that although Plaintiff worked as a custodian for his apartment building, his roommate testified that he had trouble focusing and had to be reminded what to do.  (*Id.* at 5.)  And Bernard also argues that Dr. Karayusuf's opinion about Plaintiff's disabling tremors is supported by the testimony of Plaintiff's roommate. (*Id.* at 7.)

A treating physician's opinion is normally entitled to great weight, but it does not automatically control because the record must be evaluated as a whole. *Prosch v. Apfel*, 201 F.3d 1010, 1012–13 (8th Cir. 2000).  The ALJ must always give good reasons for the particular weight given to a treating physician's evaluation.  *Id.* at 1013.  This Court finds that when alcoholism is considered in combination with Plaintiff's mental impairments, the record as a whole is

22

consistent with the Johnson/Graff opinion, and the ALJ did not provide good reasons for finding otherwise.  However, if one assumes Plaintiff were to stop drinking, as the regulations require, the ALJ's reasons for discrediting the Johnson/Graff opinion suggest Plaintiff could perform the limited work described by the state agency consultants.

The record reflects that when Plaintiff first saw Mr. Graff and Dr. Johnson, alcoholism reportedly was an active problem for him.  (Tr. 328.)  But just five days later, Plaintiff was evaluated by Dr. Karayusuf and Plaintiff reported that his last drink was one month earlier.  (Tr. 272–74.)  At that time, Dr. Karayusuf stated that he was uncertain whether Plaintiff's tremors were anxiety-related, as Plaintiff claimed, or from alcohol withdrawal, as Plaintiff admitted to a history of withdrawal tremors.  (Tr. 273–74.)  Within the next month, however, Plaintiff was feeling less depressed and more energetic.  (Tr. 331.)  At that time, Plaintiff had discontinued his medications for depression and insomnia and started taking a mood stabilizer.  (Tr. 331.)  There is no evidence suggesting whether or not Plaintiff was drinking at that time.

However, when Plaintiff saw Dr. David Klevan in May 2008, he drank before the appointment, and Dr. Klevan opined that Plaintiff looked "to be clearly losing control of his life due to alcohol."  (Tr. 311–12.)  And the next month Plaintiff told Graff he had been drinking quite a bit and not taking care of himself. (Tr. 330.)  When Plaintiff returned in November 2008, he said he was drinking almost every day, but he also stated that he had not been especially depressed

most of the summer.  (Tr. 361.)  At that time, Graff noted he could see why Plaintiff was denied disability benefits.  (*Id.*)  When Plaintiff returned to Graff in May 2009, he had stopped his mood stabilizer medication and Graff noted Plaintiff had no life beyond drinking and he looked ten years older than he was. (Tr. 358–59.)  The next month, Plaintiff was sleeping better but was still depressed and drinking every night.  (Tr. 356.)

Graff and Dr. Johnson opined that Plaintiff was disabled even when he was not drinking because he presented as a "broken man."  (Tr. 374.)  However, the record indicates Plaintiff was almost always drinking.  Even Plaintiff's former roommate testified that Plaintiff bought alcohol whenever he was paid.  (Tr. 45.) This is not a person who could perform full-time competitive employment when alcoholism is considered in combination with his other impairments.  The ALJ erred in finding otherwise.  Nonetheless, the error was harmless.[8]

If a claimant is disabled when alcoholism is considered in combination with the claimant's other impairments, the next step of the analysis is to determine if alcoholism is a contributing factor material to disability.  20 C.F.R. § 404.1535(a). The key factor in this determination is whether the claimant would still be disabled if he stopped using alcohol.  *Id.* § 1535(b)(1).  The ALJ must evaluate which of the claimant's physical and mental limitations would remain if he

---

[8]     An ALJ error is harmless unless the claimant provides "some indication that the ALJ would have decided differently if the error had not occurred."  *Byes v. Astrue*, 687 F.3d 913, 917 (8th Cir. 2012).

stopped using alcohol, and whether those limitations would be disabling. *Id.*

§ 1535(b)(2). If the claimant's remaining limitations would not be disabling,

alcoholism is a contributing factor material to disability, and the claimant is not

disabled. *Id.* § 1535(b)(2)(i); *Brueggemann v. Barnhart*, 348 F.3d 689, 693 (8th

Cir. 2003).

There is substantial evidence in the record to support the conclusion that

Plaintiff's remaining limitations would not be disabling if he was not using alcohol.

First, contrary to the testimony of Plaintiff's former roommate that Plaintiff shook

all the time because he was nervous, the only time any medical provider

observed Plaintiff having tremors was at Plaintiff's psychological consultative

examination. Furthermore, neither Graff nor Dr. Johnson diagnosed Plaintiff with

an anxiety disorder, and Plaintiff had a history of withdrawal tremors. Substantial

evidence in the record supports a finding that Plaintiff's tremors would not

preclude him from full-time competitive employment, if Plaintiff stopped using

alcohol.

In addition, Plaintiff discontinued medications to treat insomnia and

depression. (Tr. 331, 359); *see Guilliams v. Barnhart*, 393 F.3d 798, 802 (8th

Cir. 2005) (stating that failure to follow a recommended course of treatment

weighs against a claimant's credibility). And when Plaintiff took mirtazapine his

symptoms improved. (Tr. 356, 358); *see Guilliams*, 393 F.3d at 802 (stating that

evidence of effective medication may diminish the credibility of a claimant's

complaints). Also, Plaintiff made a number of statements that were inconsistent

with disabling depression and anxiety. Plaintiff appeared to be in a normal, non-depressed mood in November 2008, and said he had not been especially depressed most of the summer, but he just was not up for finding a job. (Tr. 361.) This is when Graff commented that he could see why Plaintiff was denied disability benefits. (*Id.*) Then, in May 2009, Plaintiff said that if his disability application was denied, he might just have to go get a job. (Tr. 358.) Plaintiff's daily activities, work history, and attempts to find employment suggest that if he stopped drinking, he was capable of competitive work and interactions with others. Although he did not have a driver's license due to previous DUIs, he rode his bike to nearby buildings to apply for jobs. He worked part-time as a custodian to reduce his rent. And he played cards with friends weekly. Plaintiff's last employment did not end with disability—it ended because the job was temporary. If Plaintiff was not drinking, substantial evidence in the record suggests he would be able to sustain full-time competitive work limited to routine, repetitive, 3-4 step, uncomplicated instructions, and only brief and superficial contact with coworkers and the public, as found by the ALJ.

Although the record as a whole presents a person who could not sustain full-time competitive employment when drinking, the law does not allow an award of social security disability if alcoholism is a contributing factor material to disability. Thus, the ALJ's error was harmless because substantial evidence in the record as a whole supports a finding that Plaintiff's remaining limitations would not be disabling if he stopped using alcohol.

## RECOMMENDATION

Based on the foregoing, and all the files, records, and proceedings herein,

**IT IS HEREBY RECOMMENDED** that:

1.      Plaintiff's Motion for Summary Judgment (Doc. No. 12), be **DENIED**;

2.      Defendant's Motion for Summary Judgment (Doc. No. 14), be

**GRANTED**;

3.      If this Report and Recommendation is adopted, that this case be

**DISMISSED WITH PREJUDICE**, and judgment be entered accordingly.


Date: July 1, 2013                     _s/ Jeffrey J. Keyes_____
                                       JEFFREY J. KEYES
                                       United States Magistrate Judge


Under D. Minn. Loc. R. 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **July 15, 2013**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections. Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals. A party may respond to the objecting party's brief within **fourteen days** after service thereof. A judge shall make a de novo review of those portions to which objection is made. This Report and Recommendation does not constitute on order or judgment of the District Court, and it is therefore not appealable to the Court of Appeals.